**NG DO-KYNAH, PC**
Daniel Do-Khanh (SBN 195323)
Anthony Cartee (SBN 248721)
8001 Irvine Center Drive, Suite 1090
Irvine, CA  92618
Telephone: (949) 748-8338
Facsimile: (949) 748-8339
Email:  daniel@ndklaw.com
Email:  acartee@ac-legal.com

**ONE LLP**
Lester J. Savit (SBN 213015)
John E. Lord (SBN 216111)
Polaphat Veravanich (SBN 203964)
4000 MacArthur Blvd, Suite 1100
Newport Beach, CA  92660
Telephone: (949) 502-2870
Facsimile: (949) 258-5081
Email:     lsavit@onellp.com
Email:     jlord@onellp.com
Email:     pv@onellp.com

Attorneys for Defendants and Counterclaimants:
Arthro-7, Inc.; Robinson Pharma, Inc.; Gero Vita, Inc.; Nutrivita Laboratories, Inc.; Suliman Jahangiri; John Hahn; Tuong Nguyen; Christine Nguyen; Dan Nguyen; and VitaStrong, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| BIOCELL TECHNOLOGY, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>ARTHRO-7, INC., a California corporation; *et al.*,<br><br>Defendants.<br><br>And RELATED COUNTERCLAIM | CASE: SACV-12-516-JVS(RNBx)<br><br>**DECLARATION OF DALE P. DEVORE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY BASED ON INDEFINITENESS**<br><br>Date:  April 15, 2013<br>Time:  1:30 PM<br>Ctrm:  10C<br>Judge: Hon. James V. Selna |

I, Dale P. DeVore, declare:

1. I am currently the Chief Scientist for Euclid Systems Corporation and I provide regulatory, clinical, and R&D consulting services to the pharmaceutical, medical device and tissue engineering industry. I have been retained as an independent expert in this action on behalf of Arthro-7, Inc.; Robinson Pharma, Inc.; Gero Vita, Inc.; Nutrivita Laboratories, Inc.; Suliman Jahangiri; John Hahn; Tuong Nguyen; Christine Nguyen; Dan Nguyen; and VitaStrong, Inc. (collectively "Defendants") in the above-captioned case. As part of that engagement I have been asked to provide analysis and expert opinions on the invalidity based on indefiniteness of certain claims of U.S. Patent Nos. 6,025,327 ("the '327 Patent"), 6,323,319 ("the '319 Patent"), 6,780,841 ("the '841 Patent"), 7,091,180 ("the '180 Patent") and 7,799,348 ("the '348 Patent") (collectively "Asserted Patents").

2. I submit this declaration in support of Defendants' Motion for Summary Judgment of Invalidity based on indefiniteness of certain claims of the Asserted Patents. If asked at hearings or trial, I am prepared to testify regarding the matters I discuss in this declaration. I have also submitted an Expert Report Regarding Invalidity of the Asserted Patents in this action.

3. I reserve the right to supplement or amend this declaration based on any new information that is relevant to my opinions.

4. I am being compensated for my work in this matter at the rate of $400 per hour plus expenses. My compensation is in no way tied to the outcome of this matter.

## PROFESSIONAL BACKGROUND

5. I received my B.S, M.S. and Ph.D. all in Food Science & Technology and Biochemistry from Rutgers University. I received my Ph.D. in 1973, and subsequently joined Battelle Memorial Institute in Columbus, OH as a Research Biochemist. At Battelle, I was awarded five NIH grants and two Arthritis

Foundation grants. The latter grants focused on determining the mechanism of action of D-penicillamine as a remission inducing drug to treat rheumatoid arthritis.

6. A more complete summary of my qualifications, educational background, career history, publications, and other relevant information can be found on my curriculum vitae, attached to this declaration as Exhibit A.

7. I have worked as an expert in several legal matters as a consulting expert and an expert witness. I have written expert reports and have had my deposition taken.

## **APPLICABLE LEGAL PRINCIPLES**

8. In this section I describe my understanding of certain legal standards. I have been informed of these legal standards by Defendants' attorneys. I am not an attorney and I am relying only on instructions from Defendants' attorneys for these legal standards.

9. I am informed that summary judgment is appropriate when there is no genuine issue as to any material fact and the party moving for summary judgment is entitled to judgment as a matter of law. I am informed that the movant bears the initial burden of demonstrating that no genuine issue of material fact exists. Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party must designate specific facts showing that there is a genuine issue for trial. I am informed that there is no genuine issue of material fact if the evidence is of insufficient caliber or quantity to allow a rational finder of fact to find for the nonmoving party.

10. I am informed by counsel that a person having ordinary skill in the art is a hypothetical person who is used to analyzing the prior art without the benefit of hindsight. A person of ordinary skill in the art is presumed to be one who thinks along the lines of conventional wisdom in the art and is not one who undertakes to

DECLARATION OF DALE P. DEVORE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

innovate, whether by extraordinary insights or by patient and often expensive systematic research.

11. I am further informed by counsel that the hypothetical person of ordinary skill is presumed to have knowledge of all references that are sufficiently related to one another and to the pertinent art, and to have knowledge of all arts reasonably pertinent to the particular problem that the claimed invention addresses.

12. It is my understanding that a patent must conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. Patent claims must be sufficiently clear that a person of ordinary skill in the field of the invention reading them is able to determine what the claims cover and what they do not cover. If a patent claim fails to do this, it is indefinite. I further understand that the purpose of the definiteness requirement is to ensure that the claims clearly delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude.

13. I have written this Report with the understanding that indefiniteness must be shown by clear and convincing evidence.

## LEVEL AS TO ORDINARY SKILL IN THE ART

14. I believe that a person of ordinary skill in the art relating to the Asserted Patents would have at least a Bachelor's Degree in chemistry or bio-chemistry (or equivalent industry experience) and at least two years of experience in the area of protein chemistry and analysis.

## CLAIM CONSTRUCTION

15. I understand that a patent may include two types of claims, independent claims and dependent claims. An independent claim stands alone and includes only the limitations it recites. A dependent claim can depend from an independent claim or another dependent claim. I understand that a dependent claim includes all the

limitations that it recites in addition to all of the limitations recited in the claim from which it depends.  I am informed by counsel that claim construction is a matter of law for the Court to decide.

16.  I have considered the claim elements in the Asserted Patents under the Court's Order Granting Stipulation Regarding Claim Term Definitions For All Patents dated December 19, 2012.

## OVERVIEW OF THE ASSERTED PATENTS

17.  I understand that Plaintiffs Biocell Technology, LLC and Intellipi, Inc. (collectively "Biocell") have alleged infringement of five separate patents, defined as the Asserted Patents in paragraph 1 of this report.  I have read and analyzed each of the Asserted Patents in their entirety.  The Asserted patents generally disclose hydrolyzed collagen type II and the composition, use, and methods of use for hydrolyzed collagen type II.  Below I offer a brief overview of each patent.

18.  The '327 Patent, entitled "Hydrolyzed Collagen Type II and Use Thereof," issued on February 15, 2000, from an application filed on August 8, 1997.  The named inventor of the '327 Patent is Ahmed Alkayali.  According to the Abstract, the '327 Patent relates to "[h]ydrolyzed collagen type II powder compositions, method of preparing the compositions and use of the compositions in treating cartilage defects.  The compositions are orally administered to an individual in need of cartilage augmentation in a daily dosage of between 2,000 and 3,000 mg per day."  The '327 Patent discloses hydrolyzed collagen fragments with an average molecular weight between 1,500 and 2,500 daltons, preferably 1,800 daltons.

19.  The '319 Patent, entitled "Method of Making Hydrolyzed Collagen Type II," issued on November 27, 2001, from an application filed on December 2, 1999.  The named inventor of the '319 Patent is Ahmed Alkayali.  According to the Abstract, the '319 Patent relates to "[h]ydrolyzed collagen type II powder

DECLARATION OF DALE P. DEVORE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

compositions, method of preparing the compositions and use of the compositions in treating cartilage defects. The compositions are orally administered to an individual in need of cartilage augmentation in a daily dosage of between about 2,000 and 3,000 mg per day." The '319 Patent discloses hydrolyzed collagen fragments with an average molecular weight between 1,500 and 2,500 daltons, preferably 1,800 daltons.

    20. The '841 Patent, entitled "Hyaluronic Acid and Chondroitin Sulfate Based Hydrolyzed Collagen Type II and Method of Making Same," issued on August 24, 2004, from an application filed on November 13, 2001. The named inventor of the '841 Patent is Suhail Ishaq. According to the Abstract, the '841 Patent relates to "[h]ydrolyzed collagen type II powder compositions for inducing cartilage formation in an individual, method of preparing the compositions and use of the compositions in treating connective tissue disorder, replenishing skin viscoelasticity. The compositions are administered through an orally ingestible delivery medium for absorption into the gastrointestinal tract. The compositions are administered through a topical delivery medium for absorption into a dermis of the individual." The '841 Patent discloses hydrolyzed collagen fragments with an average molecular weight between 50 and 10,000 daltons, preferably 5,500 daltons.

    21. The '180 Patent, entitled "Hyaluronic Acid and Chondroitin Sulfate Based Hydrolyzed Collagen Type II and Method of Making Same," issued on August 15, 2006, from an application filed on June 17, 2004. The named inventor of the '180 Patent is Suhail Ishaq. According to the Abstract, the '180 Patent relates to "[h]ydrolyzed collagen type II powder compositions for inducing cartilage formation in an individual, method of preparing the compositions and use of the compositions in treating connective tissue disorder, replenishing skin viscoelasticity. The compositions are administered through an orally ingestible

delivery medium for absorption into the gastrointestinal tract. The compositions are administered through a topical delivery medium for absorption into a dermis of the individual." The '180 Patent discloses hydrolyzed collagen fragments with an average molecular weight between 50 and 10,000 daltons, preferably 5,500 daltons.

22. The '348 Patent, entitled "Therapeutic Composition Comprising Hyaluronic Acid and Chondroitin Sulfate and Method of Making Same," issued on September 21, 2010, from an application filed on August 26, 2005. The named inventor of the '348 Patent is Suhail Ishaq. According to the Abstract, the '348 Patent relates to "[h]ydrolyzed collagen type II powder compositions for inducing cartilage formation in an individual, method of preparing the compositions and use of the compositions in treating connective tissue disorder, replenishing skin viscoelasticity. The compositions are administered through an orally ingestible delivery medium for absorption into the gastrointestinal tract. The compositions are administered through a topical delivery medium for absorption into a dermis of the individual." The '348 Patent discloses hydrolyzed collagen fragments with an average molecular weight between 50 and 10,000 daltons, preferably 5,500 daltons.

## OVERVIEW OF MOLECULAR WEIGHT OF COLLAGEN TYPE II

23. Most collagen molecules, including collagen type II molecules, exhibit a molecular weight of 300,000 daltons. According to the application of collagen Type II in the Asserted Patents, this molecular weight is too large to easily pass through the intestinal wall. Hydrolysis (using proteolytic enzymes, according to the patents specification) results in reducing the collagen proteins of about 300,000 daltons into small peptides having an average molecular weight between 2,000 and 5,000 daltons. The effectiveness of collagen hydrolysis depends on several factors

including the enzyme specificity, enzyme activity, temperature, hydrolysis time and pH conditions. All may have an impact on the rate of hydrolysis and the ultimate molecular weight of the collagen peptides.

24. According to the application of the Asserted Patents, molecular weight acts as one of the most important factors for the functional behavior of the collagen Type II. For example, the '319 Patent at col.3:34-36 states that "the molecular weight and amino acid composition promote optimal assimilation of the petides."

25. The claims of the Asserted Patents provide ranges for the collagen type II molecular weight fragments produced by enzymatic hydrolysis. For example, claims 1, 2 and 7 of the '327 patent and claim 1 of the '319 patent describe a molecular weight range from 1,500 and 2,500 daltons. Claim 1 of the '841 patent describes a molecular weight range from 5,500 to about 10,000 daltons. Finally, Claim 1 of the '180 patent and Claim 1 of the '348 patent describe a molecular weight range from 50 to 10,000 daltons. The reason(s) for the various molecular weight ranges, however, is not described in the patents.

26. There is no single accepted standard in the industry for measuring the "average molecular weight" of a molecule. There are several standard methods to determine the molecular weight of collagens and collagen peptides including gel filtration chromatography or gel permeation chromatography (GPC), Sodium Dodecyl Sulfate (SDS) Polyacrylamide Gel Electrophoresis (PAGE), and MALDI-TOF Mass Spectrometric Analysis. GPC is a relative technique in which the molecular weight data is generated by comparing the sample of interest against a standard of known molecular weight. Most often the standards are of a material which is different than the material being tested. This is where the term "relative" comes in. GPC is not an absolute technique. You will not get absolute (accurate) mass data from GPC with either UV or RI detection.

27. The method and conditions used to determine the molecular weight profile

DECLARATION OF DALE P. DEVORE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

to see if it falls within the claimed ranges is critical to characterizing the composition. Knowing the proper method to determine the molecular weight profile is necessary to practice the invention as described in the Asserted Patents. Neither the patents' specifications nor the prosecution history provide explicit or implicit guidance regarding the methods used to determine the molecular weight profiles, and therefore molecular weight ranges.

## INVALIDITY BASED ON INDEFINITENESS OF CERTAIN CLAIMS OF THE ASSERTED PATENTS

28. It is my opinion that the claim phrase "having an average molecular weight of" as that phrase appears in, either independent or dependent form, claims 1, 2 and 7 of the '327 Patent; claims 1-8 of the '319 Patent; claims 1-17 of the '841 patent; claims 1-23 of the '180 Patent; and claims 1-25 of the '348 Patent, renders these claims invalid as indefinite.

29. As described in the preceding section, there is no single accepted standard in the industry for measuring the "average molecular weight" of a molecule. Several standard methods include gel filtration chromatography or gel permeation chromatography (GPC), Sodium Dodecyl Sulfate (SDS) Polyacrylamide Gel Electrophoresis (PAGE), and MALDI-TOF Mass Spectrometric Analysis. When measuring molecular weight by any method, the sample must be dissolved in an appropriate solution. This was not described in any of the patents. If the molecular weight was estimated by GPC or HPLC analysis, for example, conditions for conducting the analysis were not described, including column type, elution conditions, detection methods, etc. Standards must be carefully chosen to achieve the molecular weight, and depending on the type of method to be used, the average molecular weight calculation for a given composition can vary.

30. I understand the parties have agreed to a construction of the claim as "The

weighted arithmetic average of the molecular weight of all the chains in a polymer." This still provides no guidance as to how one of skill in the art determines the average molecular weight as practiced by the inventors as a number of different methods and test conditions can be used as described above.

31. Due to the failure to provide details of the methods and conditions for measuring molecular weight distribution profiles described in the patents, one of skill in the art would not know how the disclosed molecular weight ranges were achieved. For example, the '327 and '319 Patents disclose molecular weight ranges of between 1,500 and 2,500 daltons, preferably 1,800 daltons. And the '841, '180 and '348 Patents disclose molecular weight ranges of between 50 and 10,000 daltons, preferably 5,500 daltons. It is generally known, however, that procedures used to prepare collagen hydrolysates typically yield a molecular weight of peptides from 1,000 to 30,000 daltons, where the higher end is well above the range disclosed in the patents.

32. Neither the patent specifications nor prosecution history provide any explicit or implicit guidance on how to measure molecular weight of the hydrolyzed collagen and no specific methods were described in any of the Asserted Patents.

33. In my opinion, a person of ordinary skill in the art would question whether a composition falls within the molecular weight range limitations of the claims, unless test samples were analyzed using identical methods and with identical test standards.

34. A given composition would simultaneously infringe and not infringe depending on what type of test one used, and what types of standards and conditions were used, to determine the average molecular weight. Thus, one of skill in the art would not know if a particular composition standing alone falls within the claim scope or not.

DECLARATION OF DALE P. DEVORE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I declare under penalty of perjury that the foregoing is true and correct. Executed in Chelmsford, Massachusetts on March 18, 2013.

By: *Dale P. DeVore*
Dale P. DeVore

DECLARATION OF DALE P. DEVORE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT