# Exhibit B

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

BIOCELL TECHNOLOGY, LLC, a

California limited liability company,

Plaintiff,

v.

ARTHRO-7 INC. A CALIFORNIA CORPORATION; et al.,

Defendants,

AND RELATED COUNTERCLAIM

Case No. SACV-12-516-JVS (RNBx)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Jury Trial Demanded

**EXPERT REPORT BY DR. DALE P. DEVORE REGARDING INVALIDITY OF U.S. PATENT NOS. 6,025,327, 6,323,319, 6,780,841, 7,091,180 AND 7,799,348**

B-1

# I.     INTRODUCTION AND QUALIFICATIONS

My name is Dale P. Devore, and I have been retained as an independent expert in this action on behalf of Arthro-7, Inc.; Robinson Pharma, Inc.; Gero Vita, Inc.; Nutrivita Laboratories, Inc.; Suliman Jahangiri; John Hahn; Tuong Nguyen; Christine Nguyen; Dan Nguyen; and VitaStrong, Inc. ("Defendants") in connection with the litigation against BioCell Technology, LLC and Intellipi, LLC ("Plaintiffs").

In this report I will set forth my opinions regarding the invalidity of U.S. patent Nos. 6,025,327 ("the '327 Patent"), 6,323,319 ("the '319 Patent"), 6,780,841 ("the '841 Patent"), 7,091,180 ("the '180 Patent") and 7,799,348 ("the '348 Patent") (collectively "Asserted Patents"). This report contains a statement of my opinions formed in this case and provides the bases and reasons for those opinions.

I am being compensated for my work on this case at my standard consulting rate of $400 per hour. I am also being reimbursed for expenses that I incur. My compensation is not contingent upon the results of my study or the substance of my testimony.

I expect to be called to provide expert testimony regarding opinions formed resulting from my analysis of the issues considered in this report. If asked to do so, I may also provide testimony describing Collagen Type I, Collagen Type II, Collagen Type III, Hydrolyzed Collagen, Hyaluronic Acid, Chondroitin Sulfate and the average molecular weight, protein count, and use of such compositions, as well as any background of the relevant technology.

Additionally, I may discuss my own work, teachings, and knowledge of the state of the art in the relevant time period. I may rely on handbooks, textbooks, technical literature, and the like to demonstrate the state of the art in the relevant period and the evolution of relevant technologies. It is also my understanding that Plaintiffs may submit an expert report responding to this report. I reserve the right to rebut any positions taken in that report.

A summary of my qualifications, educational background, career history, publications, and other relevant information can be found on my curriculum vitae, attached to this report as Exhibit A.

A list of the materials I have considered in forming my opinions in this matter is attached as Exhibit B.

In forming my opinions, I have considered, in addition to my own knowledge and experience, (a) the documents and things listed in Exhibit B as well as (b) any other references referred to or cited in this Report. All of the opinions stated in this report are based on my own personal knowledge and professional judgment; if called as a witness during the trial in this matter I am prepared to testify competently about them.

## II.     LEVEL AS TO ORDINARY SKILL IN THE ART

I believe that a person of ordinary skill in the art relating to the Asserted Patents would have at least a Bachelor's Degree in chemistry or bio-chemistry (or equivalent industry experience) and at least two years of experience in the area of protein chemistry and analysis.

## III.    LEGAL UNDERSTANDING

In this section I describe my understanding of certain legal standards. I have been informed of these legal standards by Defendants' attorneys. I am not an attorney and I am relying only on instructions from the attorneys for these legal standards.

### A.  A PERSON OF ORDINARY SKILL IN THE ART

I am informed by counsel that a person having ordinary skill in the art is a hypothetical person who is used to analyzing the prior art without the benefit of hindsight.  A person of ordinary skill in the art is presumed to be one who thinks along the lines of conventional wisdom in the art and is not one who undertakes to innovate, whether by extraordinary insights or by patient and often expensive systematic research.

I am further informed by counsel that the hypothetical person of ordinary skill is presumed to have knowledge of all references that are sufficiently related to one another and to the pertinent art, and to have knowledge of all arts reasonably pertinent to the particular problem that the claimed invention addresses.

### B.  LEGAL STANDARD OF PATENTABILITY

I am informed by counsel that in order to receive a patent an inventor must invent or discover a new and useful process, machine, manufacture, or composition of matter.  I am further informed by counsel that patent protection may be granted for any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof.

### C.  LEGAL STANDARD OF PRIOR ART

I am informed by counsel that a patent or other publication must first qualify as prior art before it can be used to invalidate a patent claim.  I am further informed by counsel that "prior art" includes public information, public knowledge, and public acts that occur before an application for a patent was filed.  Prior art may include patents, journals, publications, systems and products.

I am further informed by counsel that Section 102 of the Patent Act provides that "[a] person shall be entitled to a patent unless . . . (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or . . . (g) . . . (2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it.  In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the

other."

I have also been informed by counsel that the evidence must be "clear and convincing" for a claim to be found invalid.

### D.  LEGAL STANDARD FOR ANTICIPATION

I am informed by counsel that a prior art reference "anticipates" an asserted claim, and thus renders the claim invalid, if each and every element of the claim is disclosed in that prior art reference, either explicitly or inherently (i.e., necessarily present or implied).  I have been informed and understand that the anticipation analysis requires a comparison of the claims, pursuant to the claim construction, to the prior art on a limitation-by-limitation basis.  I have written this Report with the understanding that anticipation also must be shown by clear and convincing evidence.

### E.  LEGAL STANDARD FOR OBVIOUSNESS

It is my understanding that a patent claim is invalid if the differences between the patented subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. When considering the issue of obviousness, I understand that I should also consider so-called "secondary considerations" or objective evidence of nonobviousness which may include the following: commercial success, copying, long-standing problem or need, prior failure, skepticism, and unexpected results.

I am informed by counsel that an obviousness determination includes the consideration of various factors such as (1) the scope and content of the prior art, (2) the differences between the prior art and the asserted claims, (3) the level of ordinary skill in the art, and the (4) existence of secondary considerations.

I am further informed by counsel that an obviousness evaluation can be based on a combination of multiple prior art references. I understand that a proper obviousness analysis generally requires a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements of multiple prior art references in the way the claimed new invention does. I understand that the prior art references themselves may provide a suggestion, motivation, or reason to combine, but other times the nexus linking two or more prior art references is simple common sense.

I am further informed by counsel that a particular combination may be proven obvious merely by showing that it was obvious to try the combination.  The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability.

I am further informed by counsel that a claim can be obvious in light of a single reference, without the need to combine references, if the elements of the claim that are not found explicitly or inherently in the reference can be supplied by the common sense of one of skill in the art.

4

I have been informed and understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis. I am informed by counsel that obviousness must be proven by clear and convincing evidence and I have written this Report with the understanding that obviousness must be shown by clear and convincing evidence.

## F.  INDEFINITENESS

It is my understanding that the patent laws have requirements for the way in which patent claims are written. Patent claims must be sufficiently clear that a person of ordinary skill in the field of the invention reading them is able to determine what the claims cover and what they do not cover.  If a patent claim does not meet this requirement, then the claim is said to be indefinite, and the claim is invalid.

The amount of detail required for a claim to be definite depends on the particular invention, the prior art and the description of the invention contained in the patent. A patent claim, when read along with the rest of the patent, must reasonably inform those skilled in the field of the invention what the patent claims cover. Simply because claim language may not be precise does not automatically mean that the claim is indefinite. The claim language need only be as precise as the subject matter permits.

I have written this Report with the understanding that indefiniteness must be shown by clear and convincing evidence.

## G.  WRITTEN DESCRIPTION AND ENABLEMENT

I understand that a patent may be deemed invalid if it fails to contain a written description of the invention that is sufficient to convey to one of ordinary skill in the art that the inventor had possession of the claimed invention at the time the inventor filed for his patent. I understand this to be legally referred to as the "written description" requirement.

I also understand that the patent specification must teach one of ordinary skill in the art, at the time the patent application was filed, how to make and use the full scope of the claimed invention without undue experimentation. I understand this to be legally referred to as the "enablement" requirement.  Undue experimentation is based on the level of skill in the art as of the effective filing date of the application for the patents at issue.

I have written this report with understanding that invalidity for lack of written description or enablement must be shown by clear and convincing evidence.

## H.  CLAIM CONSTRUCTION

I understand that a patent may include two types of claims, independent claims and dependent claims. An independent claim stands alone and includes only the limitations it recites. A dependent claim can depend from an independent claim or another dependent claim. I understand that a dependent claim includes all the limitations that it recites in addition to all of the limitations recited in the claim from which it depends.  I am informed by counsel that claim construction is a matter of law for the Court to decide.

I have considered the claim elements in the Asserted Patents under the Court's Order Granting Stipulation Regarding Claim Term Definitions For All Patents Dated December 19, 2012.  (Document 80), attached to this report as Exhibit C.

## IV.    THE '327 PATENT

### A.  BACKGROUND OF THE PATENT

The '327 Patent, entitled "Hydrolyzed Collagen Type II and Use Thereof," issued on February 15, 2000, from an application filed on August 8, 1997.  The named inventor of the '327 Patent is Ahmed Alkayali.  According to the Abstract, the '327 Patent relates to "[h]ydrolyzed collagen type II powder compositions, method of preparing the compositions and use of the compositions in treating cartilage defects.  The compositions are orally administered to an individual in need of cartilage augmentation in a daily dosage of between 2,000 and 3,000 mg per day."

### B.  OVERVIEW OF THE PRIOR ART

It is my opinion that claims 1-7 of the '327 Patent are anticipated or rendered obvious in light of the prior art references discussed below, either alone or in combination with other prior art specifically discussed below. In particular, each of these prior art references may be combined with other prior art references, or with information known to persons skilled in the art at the time of the alleged invention.  I understand that the '327 asserted claims include the claims relied upon by Plaintiff for its infringement allegations.

The use of chicken sternal cartilage-derived material comprising Type II collagen, either undenatured or hydrolyzed, with a variety of molecular weight ranges was well known in the field prior to the filing date of August 8, 1997, or the effective date of August 8, 1996.  In addition, compositions of enzymatically hydrolyzed collagen prepared from animal tissues, exhibiting molecular weights ranging from 1000 daltons to 40,000 daltons was well known in the field.  Below I describe several patents and printed publications related to the composition and methods described in the '327 Patent claims.

U.S. Patent 5,645,851 (the "'851 Patent" or "Moore") – The '851 Patent, entitled "Product for Alleviating the Systems of Arthritis in Mammals" was filed on April 9, 1996 and issued on July 8, 1997.  It describes a composition for treatment of arthritis. The composition contains Type II collagen prepared from chicken cartilage.  It additionally discloses water insoluble suspended in a liquid form for oral consumption. The prior art has used more complicated methods to breakdown and to depolymerize.

U.S. Patent 5,399,347 (the "'347 Patent" or "Trentham") - The '347 Patent, entitled "Method of Treating Rheumatoid Arthritis with Type II Collagen" was filed on September 25, 1992, and issued on March 21, 1995.  It describes a method and pharmaceutical formulations for treatment of autoimmune arthritis in mammals. It also discusses the use of whole collagen protein or biologically active fragments administered orally, most preferably Type II collagen.

U.S. Patent 5,948,766 (the "'766 Patent" or "Milan") – The '766 Patent, entitled "Use of Tasteless, Hydrolyzed Collagen and Agent Containing the Same" was PCT filed on August 19,

1995, and has a PCT publication date of February 29, 1996, and a US issuance date of September 7, 1999. The '766 Patent describes a method for treating osteoporosis by administering (oral) enzymatically hydrolyzed collagen from gelatin or animal connective tissue having a molecular weight of 1-40Kd (1,000-40,000 daltons) determined by HPLC. It also discloses the use of Collagen Type I prepared from bone. The '766 Patent discloses the use of Gelaiasol, with a molecular weight of 3.5 kD in one example. It also discloses modes of preparation as paste, syrup, solution, granules, or powder, and an amount of dosage in the range of 0.5-12g.

U.S. Patent 4,804,745 (the "'745 Patent" or "Koepff") – The '745 Patent, entitled "Agents for the Treatment of Arthroses" was filed on July 1, 1987, and issued on February 14, 1989. It describes a composition for treatment of arthroses, comprising soluble, hydrolyzed collagen peptides having an average molecular weight from about 10,000 to 80,000 daltons. Also disclosed is an enzyme hydrolyzed, and preparations include Gelita-Sol D, Egg white proteins, and Gelatin powder. The disclosed patent is stated as being effective in reducing symptoms of arthroses.

Hormel Memo ("Hormel") – The Hormel Memo is a letter or memorandum from Mr. Ahmad Alkayali to Mr. David Hagman of Hormel Foods Corporation with a subject line stating : "SUBJECT: CHICKEN COLLAGEN TYPE II (FOOD GRADE)." The version I have reviewed is undated, but an accompanying declaration in the file history states that the memo is dated prior to January 5, 1996. The Hormel Memo also includes a flow chart entitled "flow sheet – sternal chicken cartilage hydrolysate." This flow chart is also undated, but similar to the memo, I have reviewed an accompanying declaration in the file history stating that the flowchart is dated prior to January 5, 1996.

## C. ANTICIPATION

    **i.**   **Hormel[1] -** In my opinion, the Hormel reference embodied each and every limitation of claims 1 and 7 of the '327 Patent, and therefore anticipates these claims. The chart below provides an element by element invalidity analysis.

| Patent No. 6,025,327 – Asserted Claims | Hormel |
|---|---|
| 1. Chicken sternal cartilage-derived material comprising hydrolyzed collagen type II, said hydrolyzed collagen type II having an average molecular | Hormel discloses a "Chicken Collaged Type II" Product with the following specification:<br><br>-   NATIVE TYPE II COLLAGEN, EXTRACTED FROM STERNAL CARTILAGE OF CHICKS.<br>-   FREEZE-DRIED OR IN POWDER FORM – |

---

[1] I understand the Hormel reference may also invalidate the '327 Patent based on public use or on-sale bar pursuant to 102(b). My opinion, however, of the Hormel reference rests under an anticipation analysis. I have not formed any legal opinion as to whether it also invalidates the '327 Patent under the public use or on-sale bar.

| | |
|---|---|
| weight of between about 1,500 and 2,500 daltons. | HYDROLYZED POWDER PROTEIN – AVERAGE M.W. 1500-2500. MOISTURE CONTENT 5%-7% FAT AND CHOLESTEROL FREE<br><br>Hormel also discloses a flow diagram entitled "flow sheet sternal chicken cartilage hydrolysate" that is identical to Fig. 1 of the '327 Patent.  The Hormel flow chart is understood by one of skill in the art to be the process for preparing the hydrolyzed collagen type II powder of the invention. |
| 7. A method of providing collagen type II as a nutritional supplement, comprising orally administering to an individual a daily dosage of chicken sternal cartilage-derived material comprising hydrolyzed collagen type II having an average molecular weight of between about 1,500 and 2,500 daltons. | See claim 1 analysis.<br>Also, Hormel discloses that the intentions "are to market the collagen as a food supplement."  This indicates to one of skill in the art that disclosed is a method of providing collagen type II as a nutritional supplement by orally administering chicken-cartilage derived material comprising hydrolyzed collagen type II having an average molecular weight of between about 1500-2500 daltons. |

**D.  OBVIOUSNESS**

My understanding of the law regarding obviousness is set forth above.  In this section, I will address the various factors and combinations that form the basis of my opinion that one of skill would have found the alleged invention claimed in '327 Patent to have been obvious at the time of invention.

**i.**   **Scope and Content of Prior Art**

The scope and content of the prior art are discussed above.  Briefly, the prior art in combination included chicken sternal cartilage-derived material comprising hydrolyzed collagen type II with an average molecular weight of between about 1500 and 2500 daltons.

**ii.**   **Level of Ordinary Skill in the Art**

My opinion of the level of ordinary skill in the field of art is noted above at Section II.

**iii.**   **Differences between the Prior Art and the Claimed Invention**

There were differences between some of the claims of the '327 Patent and some of the prior art that I discussed above.  The following differences would have been obvious to one of ordinary skill in the art.  As shown in the Combinations below, prior art publications in combination not only foreshadow these combinations, but in fact actually practiced them. Additionally, persons of ordinary skill were motivated to combine the prior art elements recited

8

in the '327 Patent claims to achieve the same results described in the '327 Patent specification. Together, the combination of these familiar elements yields only expected results. Below is an element-by-element claim chart comparing each of the asserted claims of the '327 Patent to prior art that renders the asserted claims invalid as obvious.

iv.   Combinations

| Patent No. 6,025,327 – Asserted Claims | At the time of the alleged invention, it would have been obvious to combine Trentham with Milan to achieve Claims 1 and 2 |
|---|---|
| 1. Chicken sternal cartilage-derived material comprising hydrolyzed collagen type II, said hydrolyzed collagen type II having an average molecular weight of between about 1,500 and 2,500 daltons. | Trentham teaches the application of compositions comprised of type II collagen prepared from chicken cartilage for treatment of rheumatoid arthritis and Milan teaches the oral administration of enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons. In my opinion there is motivation to combine these references to render obvious the asserted claim 1 of the '327 patent. |
| 2. A method for treating an individual with a connective tissue disorder, comprising orally administering to said individual an effective daily amount of chicken sternal cartilage-derived material comprising hydrolyzed collagen type II having an average molecular weight of between about 1,500 and 2,500 daltons. | Trentham teaches the oral administration of Type II collagen protein for treating rheumatoid arthritis in an amount effective and for a period of time sufficient to decrease at least one symptom selected from the group consisting of joint tenderness, joint swelling, grip strength, and 50-foot walk time and Milan et al teaches the preparation of an enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons. In my opinion there is motivation to combine these references to render obvious the asserted claim 2 of the '327 patent. |
| | At the time of the alleged invention, it would have been obvious to combine Trentham with Koepff to achieve Claim 3 |
| 3. The method of claim 2, wherein said connective tissue disorder is selected from the group consisting of degenerative joint diseases, joint defects, osteoarthritis, | Trentham teaches the oral administration of Type II collagen protein for treating rheumatoid arthritis in an amount effective and for a period of time sufficient to decrease at least one symptom selected from the group consisting of joint tenderness, joint swelling, grip strength, and 50-foot walk time and Koepff teaches the treatment of arthroses or degenerative joint diseases with hydrolyzed collagen peptides. In my opinion there is motivation to combine these |

9

| | |
|---|---|
| polychondritis, vascular disease, cartilage injuries, progressive myopia and Menier's disease. | references to render obvious the asserted claim 3 of the '327 patent. |
| | **At the time of the alleged invention, it would have been obvious to combine Trentham with Koepff to achieve Claim 4** |
| 4. A method for treating an individual with a connective tissue disorder, comprising orally administering to said individual an effective daily amount of chicken sternal cartilage-derived material comprising hydrolyzed collagen type II, wherein said effective daily amount is between about 500 and 5,000 mg. | Trentham, et.al teaches the oral administration of Type II collagen protein for treating rheumatoid arthritis in an amount effective and for a period of time sufficient to decrease at least one symptom selected from the group consisting of joint tenderness, joint swelling, grip strength, and 50-foot walk time.  Koepff teaches the administration of 0.5g (500mg) to 12 g (12,000mg) of hydrolyzed collagen peptides for treatment of arthroses.  In a described clinical study, hydrolyzed collagen peptides were administered at 10g of substance per day.  In my opinion there is motivation to combine these references to render obvious the asserted claim 4 of the '327 patent. |
| 5. The method of claim 4, wherein said effective daily amount is between about 2,000 and 4,000 mg. | See discussion above re claim 4 |
| 6. The method of claim 5, wherein said effective daily amount is between about 2,000 and 3,000 mg. | See discussion above re claim 4 |
| 7. A method of providing collagen type II as a nutritional supplement, comprising orally administering to an individual a daily dosage of chicken sternal cartilage-derived material comprising hydrolyzed collagen type II having an average molecular | At the time of the alleged invention, it would have been obvious to combine Moore with Koepff  to achieve claim 7. Moore describes a composition for treatment of arthritis. The composition contains Type II collagen prepared from chicken cartilage.  It additionally discloses water insoluble suspended in a liquid form for oral consumption. The prior art has used more complicated methods to breakdown and to depolymerize. Koepff describes a composition for treatment of arthroses, comprising soluble, hydrolyzed collagen peptides having an average molecular weight from about 10,000 to 80,000 daltons. Moore and Koepff clearly teach the oral administration of type II collagen compositions as an |

10

| weight of between about 1,500 and 2,500 daltons. | edible supplement. In my opinion there is motivation to combine these references to render obvious the asserted claim 7 of the '327 patent. |
|---|---|

  **v.** Secondary Considerations of Obviousness

  I have been informed that certain secondary considerations may be examined to determine whether a certain invention would have been obvious to one of ordinary skill in the art.  As I indicate above, I understand that secondary considerations may be addressed when relevant. In this case, it is my opinion that there are no secondary considerations that overcome the obviousness determination.

  **E.  LACK OF ENABLEMENT**

  It is my opinion that the patent is invalid for lack of enablement, as I understand the legal definition above, because the disclosure lacks details regarding the hydrolysis step, specifically the level of concentrations, and the ratio of the concentration of the hydrolyzed cartilage and the enzyme.

  **F.  INDEFINITENESS**

  In my opinion a person of skill would not have been able to determine what the claims 1-3 and 7 of the '327 Patent cover and what they do not cover. It is my opinion that these claims are indefinite.  Specifically, the term "having an average molecular weight of between about 1,500 and 2,500 daltons" by itself is not defined in the patent, and the methodology to determine molecular weight is not defined in the patent.  The specification provides little to no guidance on how to measure molecular weight.  Because it is unclear to me what type of method to measure the average molecule weight one should use, claims 1-3 and 7 of the '327 Patent are indefinite.

**V.**  **THE '319 PATENT**

  **A.  BACKGROUND OF THE PATENT**

  The '319 Patent, entitled "Method of Making Hydrolyzed Collagen Type II," issued on November 27, 2001, from an application filed on December 2, 1999.  The named inventor of the '319 Patent is Ahmed Alkayali.  According to the Abstract, the '319 Patent relates to "[h]ydrolyzed collagen type II powder compositions, method of preparing the compositions and use of the compositions in treating cartilage defects.  The compositions are orally administered to an individual in need of cartilage augmentation in a daily dosage of between about 2,000 and 3,000 mg per day."

  **B.  OVERVIEW OF THE PRIOR ART**

  It is my opinion that claims 1-8 of the '319 Patent are rendered obvious in light of the prior art references discussed below, either alone or in combination with other prior art specifically discussed below. In particular, each of these prior art references may be combined with other prior art references, or with information known to persons skilled in the art at the time of the alleged invention.  I understand that the '319 asserted claims include the claims relied upon by Plaintiff for its infringement allegations.

  US Patent 5,948,766 (the "'766 Patent" or "Milan") – The '766 Patent, entitled "Use of Tasteless, Hydrolyzed Collagen and Agent Containing the Same" was PCT filed on August 19,

1995, a PCT publication date of February 29, 1996, and a U.S. issuance date of September 7, 1999. The '766 Patent describes a method for treating osteoporosis by administering (oral) enzymatically hydrolyzed collagen from gelatin or animal connective tissue having a molecular weight of 1-40Kd (1,000-40,000 daltons) determined by HPLC. It also discloses the use of Collagen Type I prepared from bone. The '766 Patent discloses the use of Gelitasol, with a molecular weight of 3.5 kD in one example. It also discloses modes of preparation as paste, syrup, solution, granules, or powder, and an amount of dosage in the range of 0.5-12g.

US Patent 4,804,745 (the "'745 Patent" or "Koepff") – The '745 Patent, entitled "Agents for the Treatment of Arthroses" was filed on July 1, 1987, and issued on February 14, 1989. It describes a composition for treatment of arthroses, comprising soluble, hydrolyzed collagen peptides having an average molecular weight from about 10,000 to 80,000 daltons. Also disclosed is an enzyme hydrolyzed, and preparations include Gelitasol D, Egg white proteins, and Gelatin powder. The disclosed patent is stated as being effective in reducing symptoms of arthroses.

US Patent 5,840,848 (the "'848 Patent" of "Sturrock") – The '848 Patent, entitled "Method for Preparation of Type II Collagen" was filed on January 3, 1997, and issued on November 24, 1998. The '848 Patent describes a process for preparation of Type II collagen from chicken sternal, and methods for removing Type I collagen perichondrium from cartilaginous tissue. The patent additionally describes an application of various enzymes to hydrolyze Type I collagen tissue and to remove proteoglycans. The patent discloses pepsin, and other proteolytic enzymes such as chymotrypsin, papain, chymopapain, ficin, and trypsin. After removal of Type I contaminants and proteoglycans, insoluble Type II collagen hydrolyzed enzymically to produce purified Type II for pharmaceutical use is also disclosed.

Hormel Memo ("Hormel") – The Hormel Memo is a letter or memorandum from Mr. Ahmad Alkayali to Mr. David Hagman of Hormel Foods Corporation with a subject line stating : "SUBJECT: CHICKEN COLLAGEN TYPE II (FOOD GRADE)." The version I have reviewed is undated, but an accompanying declaration in the file history states that the memo is dated prior to January 5, 1996. The Hormel Memo also includes a flow chart entitled "flow sheet – sternal chicken cartilage hydrolysate." This flow chart is also undated, but similar to the memo, I have reviewed an accompanying declaration in the file history stating that the flowchart is dated prior to January 5, 1996.

## C. OBVIOUSNESS

My understanding of the law regarding obviousness is set forth above. In this section, I will address the various factors and combinations that form the basis of my opinion that one of skill would have found the alleged invention claimed in '319 patent to have been obvious at the time of invention.

### i.   Scope and Content of Prior Art
The scope and content of the prior art are discussed above.

### ii.   Level of Ordinary Skill in the Art
My opinion of the level of ordinary skill in the field of art is noted above at Section II.

### iii.    Differences between the Prior Art and the Claimed Invention

There were differences between some of the claims of the '319 Patent and some of the prior art that I discussed above. The following differences would have been obvious to one of ordinary skill in the art. Additionally, persons of ordinary skill were motivated to combine the prior art elements recited in the '319 Patent claims to achieve the same results described in the '319 Patent specification. Together, the combination of these familiar elements yields only expected results. Below is an element-by-element claim chart comparing each of the asserted claims of the '319 Patent to prior art that renders the asserted claims invalid as obvious.

### iv.    Combinations

| Patent No. 6,323,319 – Asserted Claims | At the time of the alleged invention, it would have been obvious to combine Milan and Koepff and Sturrock to achieve Claims 1-8. |
|---|---|
| 1. A method for preparing chicken sternal cartilage-derived material comprising hydrolyzed collagen type II powder, comprising the following steps: (1) cutting fresh chicken sternal cartilage to within not less than about 2 mm of the bone; (b) suspending said cartilage in an aqueous solution; (c) treating said cartilage with a proteolytic enzyme to form a hydrolysate, said proteolytic enzyme being capable of hydrolyzing collagen type II to fragments having an average molecular weight between 1,500 and 2,500 daltons; (d) sterilizing said hydrolysate; (e) filtering said hydrolysate; (f) concentrating said hydrolysate; (g) drying said hydrolysate to form a powder enriched in collagen type II; and (h) isolating said powder enriched in collagen type II. | Sturrock teaches a method for preparing Type II collagen from chicken sterna comprising steps of (1) trimming to remove any meat or bone, (2) treating sterna with proteolytic enzymes to remove remaining perichondrium, (3) freezing and pulverizing frozen sterna into a powder, and (4) enzymatically digesting powdered sterna to produce soluble type II collagen and Koepff teaches preparation of enzymatically hydrolyzed collagen comprising steps of (1) cutting fresh connective tissue, (2) washing and enzymatically hydrolyzing fresh connective tissue, (3) separation of hydrolyzed collagen, (4) filtering and re-concentration (concentrating), (5) sterilizing, and (6) spray drying the hydrolyzed collagen. |
| | I note that, as written, the language of step (1) of claim 1 includes a lower limit, i.e., "not less than about 2 mm of the bone," but does not include an upper limit. |
| | Milan teaches the oral administration of enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons. In my |

13

| | |
|---|---|
| | opinion there is motivation to combine these references to render obvious the asserted claim 1 of the '319 Patent. |
| 2. The method of claim 1, further comprising the step of freezing said cartilage after said cutting step. | See discussion re: claim 1 |
| 3. The method of claim 1, wherein said aqueous solution is water. | See discussion re: claim 1<br><br>Koepff teaches washing and enzymatically hydrolyzing fresh connective tissue. While not specifically identified, washing is generally performed using water. In my opinion there is motivation to combine these references to render obvious the asserted claim 3 of the '319 patent |
| 4. The method of claim 1, wherein said enzyme is selected from the group consisting of papain, ficin and bromelain. | See discussion re: claim 1<br><br>Sturrock teaches that enzymes used to process chicken sterna include papain, ficin, chymopapain, and other proteases and furthermore teaches that precipitated Type II collagen can readily be enzymically digested to produce soluble Type II collagen. In my opinion there is motivation to combine these references to render obvious the asserted claim 4 of the '319 patent. |
| 5. The method of claim 1, wherein said sterilizing step comprises heating said hydrolysate at about 95 degrees C - 105 degrees C for about 30 minutes. | See discussion re: claim 1<br><br>Koepff teaches sterilization of enzymatically hydrolyzed fresh connective tissue and heat solutions is a well-known method sterilization. In my opinion there is motivation to combine these references to render obvious the asserted claim 5 of the '319 patent. |
| 6. The method of claim 1, wherein said drying step comprises spray drying. | See discussion re: claim 1.<br><br>Koepff teaches spray-drying of sterilized enzymatically hydrolyzed fresh connective tissue and spray-drying is a well-known method of preparing powders.  In my opinion there is motivation to combine these references to render obvious the asserted claim 6 of the '319 patent. |
| 7. The method of claim 1, wherein step (b) | See discussion re: claim 1 |

14

| is performed at a pH between 4 and 8. | Since step (b) teaches suspending cartilage in aqueous solution (water), it is obvious that the pH could range from pH 4 to pH 8 without additional treatment. |
|---|---|
| 8. The method of claim 1, wherein step c is performed at a pH between 4 and 8. | See discussion re: claim 1<br>It is obvious to those skilled in the art that treatment with neutral proteases such as ficin, papain, and bromelain are active over a pH range between 4 and 8. |

     **v.**    Modification to the Hormel Reference within the Knowledge of One of Ordinary Skill in the Art

It is my opinion that the Hormel Reference combined with the knowledge of ordinary skill in the art renders the claims of the '327 Patent obvious. Hormel includes a flow chart that discloses the steps of cutting the frozen sternal chicken cartilage, suspending it in water, with a pH- and temp. control, and performing an enzymatic hydrolysation, and then sterilization, filtration, concentration under a vacuum, spray drying and packing. One of skill in the art would have been aware of the various parameters of cutting the chicken and temperature ranges.

     **vi.**    Secondary Considerations of Obviousness

I have been informed that certain secondary considerations may be examined to determine whether a certain invention would have been obvious to one of ordinary skill in the art. As I indicate above, I understand that secondary considerations may be addressed when relevant. In this case, it is my opinion that there are no secondary considerations that overcome the obviousness determination.

    **D. INDEFINITENESS**

In my opinion a person of skill would not have been able to determine what the claims 1-8 of the '319 Patent cover and what they do not cover. It is my opinion that these claims are indefinite. Specifically, the term "having an average molecular weight of between about 1,500 and 2,500 daltons" by itself is not defined in the patent, and the methodology to determine molecular weight is not defined in the patent. The specification provides little to no guidance on how to measure molecular weight. Because it is unclear to me what type of method to measure the average molecule weight one should use, claims 1-8 of the '319 Patent are indefinite.

**VI.    THE '841 PATENT**

    **A. BACKGROUND OF THE PATENT**

The '841 Patent, entitled "Hyaluronic Acid and Chondroitin Sulfate Based Hydrolyzed Collagen Type II and Method of Making Same," issued on August 24, 2004, from an application filed on November 13, 2001. The named inventor of the '841 Patent is Suhail Ishaq. According to the Abstract, the '841 Patent relates to "[h]ydrolyzed collagen type II powder compositions for inducing cartilage formation in an individual, method of preparing the compositions and use of the compositions in treating connective tissue disorder, replenishing skin viscoelasticity. The compositions are administered through an orally ingestible delivery medium for absorption into the gastrointestinal tract. The compositions are administered through a topical delivery medium

15

for absorption into a dermis of the individual."

## B. OVERVIEW OF THE PRIOR ART

It is my opinion that claims 1-13 and 16 of the '841 Patent[2] are anticipated or rendered obvious in light of the prior art references discussed below, either alone or in combination with other prior art specifically discussed below. In particular, each of these prior art references may be combined with other prior art references, or with information known to persons skilled in the art at the time of the alleged invention. I understand that the '841 asserted claims include the claims relied upon by Plaintiff for its infringement allegations.

The use of chicken sternal cartilage-derived material comprising Type II collagen, either undenatured or hydrolyzed, with a variety of molecular weight ranges was well known in the field prior from at least 1996. In addition, compositions of enzymatically hydrolyzed collagen prepared from animal tissues, exhibiting molecular weights ranging from 1000 daltons to 40,000 daltons was well known in the field, and the hyaluronic acid and chondroitin sulfate make up part of the cartilage content. Below I describe several patents and printed publications related to the composition and methods described in the '341 Patent claims.

U.S. Patent 6,025,327 (the "'327 Patent" or "Alkayali I") – The '327 Patent is one of the asserted patents in this litigation and is described above. Given the filing and issuance dates, my attorneys have informed me that the '327 Patent may act as prior art against the '841 Patent.

U.S. Patent 6,323,319 (the "'319 Patent" or "Alkayali II") – The '319 patent is one of the asserted patents in this litigation and is described above. Given the filing and issuance dates, my attorneys have informed me that the '319 Patent may act as prior art against the '841 Patent.

U.S. Patent 5,075,112 (the "'112 Patent" or "Lane") – The '112 Patent is entitled "Method of and Dosage Unit for Inhibiting Angiogenesis or Vascularization in an Animal Using Shark Cartilage" and was filed on February 12, 1990, and issued on December 24, 1991. The '112 Patent describes a method for inhibiting angiogenesis by administering shark cartilage in a suspension. (not hydrolyzed). Filed 2/12/1990, issued 12/24. 1991Lane

Methods of Enzymology, Structural and Contractile Proteins, Part A: Extracellular Matrix Leon Cunningham, 1982 Volume 82 ("Methods of Enzymology") – This book teaches, among other things, that cartilages are rich in proteoglycans which constitute up to 50% of the dry weight. pp.769-800.

U.S. Patent 5,399,347 (the "'347 Patent" or "Trentham") – See discussion above
U.S. Patent 5,948,766 (the "'766 Patent" or "Milan") – See discussion above
U.S. Patent 4,804,745 (the "'745 Patent" or "Koepff") – See discussion above
U.S. Patent 5,840,848 (the "'848 Patent" of "Sturrock") – See discussion above

---

[2]  It is my understanding that Plaintiff's Disclosure of Asserted Claims do not allege infringement of claims 14, 15 and 17 of the '841 Patent.

**C.  ANTICIPATION (CLAIM CHART)**

    **i.  U.S. Patent No. 6,025,327 ("'327 Patent" or "Alkayali I")**

    **ii.  U.S. Patent No. 6,323,319 ("'319 Patent" or "Alkayali II")**

In my opinion, Alkayali I and Alkayali II embody each and every limitation of claims 1-13 and 16 of the '841 Patent, and therefore anticipates these claims. The chart below provides an element by element invalidity analysis.

| Patent No. 6,780,841 – Asserted Claims | Alkayali I and Alkayali II |
|---|---|
| 1. A method for preparing chicken sternal cartilage-derived material comprising hydrolyzed collagen type II, comprising the following steps: | Alkayali I discloses a method for preparing chicken sternal cartilage including hydrolyzed collagen type II.<br><br>Alkayali II discloses a method for preparing chicken sternal cartilage including hydrolyzed collagen type II. |
| (a) cutting fresh chicken sternal cartilage to within not less than about 2 mm of the bone; | Alkayali I discloses step of cutting fresh chicken sternal cartilage to within not less than about 2 mm of the bone. Fig. 1. 2:22-38.<br><br>Alkayali II discloses step of cutting fresh chicken sternal cartilage to within not less than about 2 mm of the bone. Fig. 1. 2:22-38. |
| (b) suspending said cartilage in an aqueous solution; | Alkayali I discloses step of suspending cartilage in an aqueous solution. Fig. 1. 2:22-38.<br><br>Alkayali II discloses step of suspending cartilage in an aqueous solution. Fig.1. 2:22-38. |
| (c) treating said cartilage with a proteolytic enzyme to form a hydrolysate having at least 20% of depolymerized | Alkayali I discloses step of enzymatic hydrolysation. Fig. 1. 2:22-38. It is my opinion that one of skill in the art would find that this composition contains depolymerized chondroitin sulfate and hyaluronic acid and the cartilage containing these elements is inherent in the reference. |

17

| | |
|---|---|
| chondroitin sulfate and at least 10% of hyaluronic acid, said proteolytic enzyme being capable of hydrolyzing collagen type II to fragments having an average molecular weight of between about 5,500 to about 10,000 daltons; | Alkayali II discloses step of enzymatic hydrolysation. Fig. 1. 2:22-38.   It is my opinion that one of skill in the art would find that this composition contains depolymerized chondroitin sulfate and hyaluronic acid and the cartilage containing these elements is inherent in the reference. |
| (d) sterilizing said hydrolysate; | Alkayali I discloses step of sterilizing the hydrolystae. Fig. 1. 2:22-38.  Alkayali II discloses step of sterilizing hydrolystae. Fig. 1. 2:22-38. |
| (e) filtering said hydrolysate; | Alkayali I discloses step of filteration. Fig. 1. 2:22-38.  Alkayali II discloses step of filteration. Fig. 1. 2:22-38. |
| (f) concentrating said hydrolysate; | Alkayali I discloses step of concentrating the hydrolysate. Fig. 1. 2:22-38.  Alkayali II discloses step of concentrating the hydrolysate. Fig. 1. 2:22-38. |
| (g) drying said hydrolysate to form a powder enriched in collagen type II powder; and | Alkayali I discloses step of drying. Fig. 1. 2:22-38.  Alkayali II discloses step of drying. Fig. 1. 2:22-38. |
| (h) isolating said powder enriched in collagen type II. | Alkayali I discloses step of isolating collagen type II. Fig. 1. 2:22-38.  Alkayali II discloses step of isolating collagen type II. Fig. 1. 2:22-38. |
| 2.  The method of claim 1, further comprising the step of freezing said cartilage after said cutting step. | Alkayali I discloses freezing step. Fig. 1. 2:22-38.  Alkayali II discloses freezing step. Fig. 1. 2:22-38. |
| 3. The method of claim 1, wherein said aqueous | Alkayali I discloses use of water. 2:22-38. |

18

| | |
|---|---|
| solution is water. | Alkayali II discloses use of water.  2:22-38. |
| 4. The method of claim 1, wherein said enzyme is selected from the group consisting of papain, ficin and bromelain. | Alkayali I discloses use of enzymes.  Fig. 1. 2:22-38.<br><br>Alkayali II discloses use of enzymes. Fig. 1. 2:22-38. |
| 5. The method of claim 1, wherein said sterilizing step comprises heating said hydrolysate at about 95.degree. C.-105.degree. C. for about 30 minutes. | Alkayali I discloses step of sterilizing the hydrolystae.  Fig. 1.  2:22-38.<br><br>Alkayali II discloses step of sterilizing hydrolystae.  Fig. 1. 2:22-38. |
| 6. The method of claim 1, wherein said drying step comprises spray drying. | Alkayali I discloses step of drying.  Fig. 1. 2:22-38.<br><br>Alkayali II discloses step of drying.  Fig. 1. 2:22-38. |
| 7. The method of claim 1, wherein step (b) is performed at a pH between 4 and 8. | Alkayali I discloses pH between 4 to 8.  2:22-38.<br><br>Alkayali II discloses pH between 4 to 8.  2:22-38. |
| 8. The method of claim 1, wherein step (c) is performed at a pH between 4 and 8. | Alkayali I discloses pH between 4 to 8.  2:22-38.<br><br>Alkayali II discloses pH between 4 to 8.  2:22-38. |
| 9. Hydrolyzed collagen type II for inducing cartilage formation in an individual, said hydrolyzed collagen being derived from chicken sternal cartilage and having at least 20% of depolymerized chondroitan sulfate and at least 10% of | Alkayali II discloses hydrolyzed collagen type II derived from chicken sternum with average molecular weight between 1500 to 2500 daltons. Fig. 1.  2:1-67; 3: 1-57.  It is my opinion that one of skill in the art would find that this composition contains depolymerized chondroitin sulfate and hyaluronic acid and the cartilage containing these elements is inherent in the reference.<br><br>Alkayali II discloses hydrolyzed collagen type II derived from chicken sternum with average molecular weight between 1500 to 2500 daltons. Fig. 1.  2:1-67; 3: 1-57. It is |

19

| | |
|---|---|
| hyaluronic acid, and said hydrolyzed collagen type II having an average molecular weight of between about 5,500 to about 10,000 daltons. | my opinion that one of skill in the art would find that this composition contains depolymerized chondroitin sulfate and hyaluronic acid and the cartilage containing these elements is inherent in the reference. |
| 10. The hydrolyzed collagen type II of claim 9, wherein said hydrolyzed collagen is formed into an orally ingestible delivery medium. | Alkayali I discloses variety of delivery methods, such as powder, tablet, suspension, capsule, emulsion, syrup, mixtures, pharmaceutical formulations and compositions. 4:7-65.<br><br>Alkayali II discloses variety of delivery methods, such as powder, tablet, suspension, capsule, emulsion, syrup, mixtures, pharmaceutical formulations and compositions. 4:7-65. |
| 11. The hydrolyzed collagen type II of claim 10, wherein said orally ingestible delivery medium is chosen from the group consisting of powder, tablet, aqueous suspension, emulsion, capsule, elixir and combinations thereof. | Alkayali I discloses variety of delivery methods, such as powder, tablet, suspension, capsule, emulsion, syrup, mixtures, pharmaceutical formulations and compositions. 4:7-65.<br><br>Alkayali II discloses variety of delivery methods, such as powder, tablet, suspension, capsule, emulsion, syrup, mixtures, pharmaceutical formulations and compositions. 4:7-65. |
| 12. The hydrolyzed collagen type II of claim 9, wherein said hydrolyzed collagen is formed into a topical delivery medium. | Alkayali I discloses variety of delivery methods, such as powder, tablet, suspension, capsule, emulsion, syrup, mixtures, pharmaceutical formulations and compositions. 4:7-65.<br><br>Alkayali II discloses variety of delivery methods, such as powder, tablet, suspension, capsule, emulsion, syrup, mixtures, pharmaceutical formulations and compositions. 4:7-65. |
| 13. The hydrolyzed collagen type II of claim 12, wherein said topical delivery medium is a topical gel absorbable into a dermis. | Alkayali I discloses variety of delivery methods, such as powder, tablet, suspension, capsule, emulsion, syrup, mixtures, pharmaceutical formulations and compositions. 4:7-65.<br><br>Alkayali II discloses variety of delivery methods, such as powder, tablet, suspension, capsule, emulsion, syrup, |

20

| | mixtures, pharmaceutical formulations and compositions. 4:7-65. |
|---|---|
| 16. A method for treating a connective tissue disorder comprising orally administering an effective daily amount of chicken sternal cartilage-derived material comprising hydrolyzed collagen type II having at least 20% of depolymerized chondroitin sulfate and at least 10% of hyaluronic acid, and said hydrolyzed collagen type II having an average molecular weight of between about 5,500 to about 10,000 daltons. | Alkayali II discloses hydrolyzed collagen type II derived from chicken sternum with average molecular weight between 1500 to 2500 daltons.  Fig. 1.  2:1-67; 3: 1-57.  Alkayali II discloses hydrolyzed collagen type II derived from chicken sternum with average molecular weight between 1500 to 2500 daltons.  Fig. 1.  2:1-67; 3: 1-57.  It is my opinion that one of skill in the art would find that this composition contains depolymerized chondroitin sulfate and hyaluronic acid and the cartilage containing these elements is inherent in the Alkayali I and Alkayali II references. |

### D.  OBVIOUSNESS

My understanding of the law regarding obviousness is set forth above.  In this section, I will address the various factors and combinations that form the basis of my opinion that one of skill would have found the alleged invention claimed in '841 Patent to have been obvious at the time of invention.

   **i.**    Scope and Content of Prior Art
The scope and content of the prior art are discussed above.

   **ii.**    Level of Ordinary Skill in the Art
My opinion of the level of ordinary skill in the field of art is noted above at Section II.

   **iii.**    Differences between the Prior Art and the Claimed Invention
There were differences between some of the claims of the '841 Patent and some of the prior art that I discussed above.  The following differences would have been obvious to one of ordinary skill in the art.  Additionally, persons of ordinary skill were motivated to, and in fact did, combine the prior art elements recited in the '841 Patent claims to achieve the same results described in the '841 Patent specification.  Together, the combination of these familiar elements yields only expected results.  Below is an element-by-element claim chart comparing each of the asserted claims of the '841 Patent to prior art that renders the asserted claims invalid as obvious.

21

iv.     Combinations

| Patent No. 6,780,841 – Asserted Claims | At the time of the alleged invention, it would have been obvious to combine Milan, Koepff, Sturrock, and Methods in Enzymology to achieve Claims 1-8. |
|---|---|
| 1. A method for preparing chicken sternal cartilage-derived material comprising hydrolyzed collagen type II powder, comprising the following steps: (1) cutting fresh chicken sternal cartilage to within not less than about 2 mm of the bone; (b) suspending said cartilage in an aqueous solution; (c) treating said cartilage with a proteolytic enzyme to form a hydrolysate having at least 20% of depolymerized chondroitin sulfate and at least 10% of hyaluronic acid, said proteolytic enzyme being capable of hydrolyzing collagen type II to fragments having an average molecular weight of between about 5,500 to about 10,000 daltons; (d) sterilizing said hydrolysate; (e) filtering said hydrolysate; (f) concentrating said hydrolysate; (g) drying said hydrolysate to form a powder enriched in collagen type II; and (h) isolating said powder enriched in collagen type II. | Sturrock teaches a method for preparing Type II collagen from chicken sterna comprising steps of (1) trimming to remove any meat or bone, (2) treating sterna with proteolytic enzymes to remove remaining perichondrium, (3) freezing and pulverizing frozen sterna into a powder, and (4) enzymatically digesting powdered sterna to produce soluble type II collagen and Koepff teaches preparation of enzymatically hydrolyzed collagen comprising steps of (1) cutting fresh connective tissue, (2) washing and enzymatically hydrolyzing fresh connective tissue, (3) separation of hydrolyzed collagen, (4) filtering and re-concentration (concentrating), (5) sterilizing, and (6) spray drying the hydrolyzed collagen. Milan teaches the oral administration of enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons.  Methods in Enzymology teaches that cartilages are rich in proteoglycans which constitute up to 50% of the dry weight. Chondroitin sulfate is the predominant component of proteoglycans. Hyaluronic acid comprises an important binding domain for sulfated glycosaminoglycans forming the proteoglycan aggregate. In my opinion there is motivation to combine these references to render obvious the asserted claim 1 of the '841 Patent. |
| 2. The method of claim 1, further comprising the step of freezing said | See above discussion re: claim 1 |

| | |
|---|---|
| cartilage after said cutting step. | |
| 3. The method of claim 1, wherein said aqueous solution is water. | See above discussion re: claim 1<br><br>Milan above teaches washing and enzymatically hydrolyzing fresh connective tissue. While not specifically identified, washing is generally performed using water. In my opinion there is motivation to combine these references to render obvious the asserted claim 3 of the '841 Patent. |
| 4. The method of claim 1, wherein said enzyme is selected from the group consisting of papain, ficin and bromelain. | See above discussion re: claim 1<br><br>Trentham above teaches that enzymes used to process chicken sterna include papain, ficin, chymopapain, and other proteases and furthermore teaches that precipitated Type II collagen can readily be enzymatically digested to produce soluble Type II collagen. In my opinion there is motivation to combine these references to render obvious the asserted claim 4 of the '841 Patent. |
| 5. The method of claim 1, wherein said sterilizing step comprises heating said hydrolysate at about 95 degrees C - 105 degrees C for about 30 minutes. | See above discussion re: claim 1<br><br>Koepff teaches sterilization of enzymatically hydrolyzed fresh connective tissue and heat solutions is a well-known method sterilization. In my opinion there is motivation to combine these references to render obvious the asserted claim 5 of the '841 Patent. |
| 6. The method of claim 1, wherein said drying step comprises spray drying. | See above discussion re: claim 1<br><br>Koepff teaches spray-drying of sterilized enzymatically hydrolyzed fresh connective tissue and spray-drying is a well-known method of preparing powders.  In my opinion there is motivation to combine these references to render obvious the asserted claim 6 of the '841 Patent. |
| 7. The method of claim 1, wherein step (b) is performed at a pH between 4 and 8. | See above discussion re: claim 1<br><br>Since step (b) teaches suspending cartilage in aqueous solution (water), it is obvious that the pH could range from pH 4 to pH 8 without additional treatment. |
| 8. The method of claim 1, wherein step c is | See above discussion re: claim 1 |

23

| | |
|---|---|
| performed at a pH between 4 and 8. | It is obvious to those skilled in the art that treatment with neutral proteases such as ficin, papain, and bromelain are active over a pH range between 4 and 8. |
| | |
| | **At the time of the alleged invention, it would have been obvious to combine US Trentham with Milan with Methods in Enzymology, and Lane to achieve Claims 9-13 and 16.** |
| | |
| 9. Hydrolyzed collagen type II for inducing cartilage formation in an individual, said hydrolyzed collagen being derived from chicken sternal cartilage and having at least 20% of depolymerized chondroitin sulfate and at least 10% of hyaluronic acid, and said hydrolyzed collagen type II having an average molecular weight of between about 5,500 to about 10,000 daltons. | Trentham teaches the application of compositions comprised of type II collagen prepared from chicken cartilage for treatment of rheumatoid arthritis and Milan et al teaches the oral administration of enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons. Reference 4 teaches that cartilages are rich in proteoglycans which constitute up to 50% of the dry weight. Chondroitin sulfate is the predominant component of proteoglycans. Hyaluronic acid comprises an important binding domain for sulfated glycosaminoglycans forming the proteoglycan aggregate.  In my opinion there is motivation to combine these references to render obvious the asserted claim 9 of the '841 patent. |
| 10. The hydrolyzed collagen type II of claim 9, wherein said hydrolyzed collagen is formed into an orally ingestible delivery medium. | See analysis re: claim 9<br><br>Milan, Moore and Koepff clearly teach the oral administration of type II collagen compositions as an edible supplement. In my opinion there is motivation to combine these references to render obvious the asserted claim 10 of the '841 patent. |
| 11. The hydrolyzed collagen type II of claim 10, wherein said orally ingestible delivery medium is chosen from the group consisting of powder, tablet, aqueous suspension, emulsion, capsule, elixir and combination thereof. | See analysis re: claim 9<br><br>Milan and Koepff teach administration of a hydrolyzed collagen in the form of a paste, syrup solution, granule, compact or instantized powder.  In my opinion there is motivation to combine these references to |

| | render obvious the asserted claim 11 of the '841 patent. |
|---|---|
| 12. The hydrolyzed collagen type II of claim 9, where said hydrolyzed collagen is formed into a topical delivery medium. | See analysis re: claim 9<br><br>Milan and Koepff teach compositions in the form of liquid suspensions and pastes that could be used for topical administration. In my opinion there is motivation to combine these references to render obvious the asserted claim 12 of the '841 Patent. |
| 13. The hydrolyzed collagen type II of claim 12, wherein said topical delivery medium is a topical gel absorbable into a dermis. | See analysis re: claim 9<br><br>In addition, Milan and Koepff teach compositions in the form of liquid suspensions and pastes that could be used for topical administration for absorption into dermis. |
| 16. A method for treating a connective tissue disorder comprising orally administering an effective daily amount of chicken sternal cartilage-derived material comprising hydrolyzed collagen type II having at least 20% of depolymerized chondroitin sulfate and at least 10% of hyaluronic acid, and said hydrolyzed collagen type II having an average molecular weight of between about 5,500 to about 10,000 daltons. | Trentham teaches the oral administration of Type II collagen protein for treating rheumatoid arthritis in an amount effective and for a period of time sufficient to decrease at least one symptom selected from the group consisting of joint tenderness, joint swelling, grip strength, and 50-foot walk time and Milan teaches the preparation of an enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons. Further, Methods of Enzymology teach esthat that cartilages are rich in proteoglycans which constitute up to 50% of the dry weight. Chondroitin sulfate is the predominant component of proteoglycans. Hyaluronic acid comprises an important binding domain for sulfated glycosaminoglycans forming the proteoglycan aggregate. In my opinion there is motivation to combine these references to render obvious the asserted claim 16 of the '841 Patent. |

    **v.**    Secondary Considerations of Obviousness

I have been informed that certain secondary considerations may be examined to determine whether a certain invention would have been obvious to one of ordinary skill in the

art.  As I indicate above, I understand that secondary considerations may be addressed when relevant. In this case, it is my opinion that there are no secondary considerations that overcome the obviousness determination.

### E.  LACK OF ENABLEMENT

It is my opinion that the patent is invalid for lack of enablement, as I understand the legal definition above, because the disclosure lacks details regarding the hydrolysis step, specifically the level of concentrations, and the ratio of the concentration of the hydrolyzed cartilage and the enzyme.

### F.  INDEFINITENESS

In my opinion a person of skill would not have been able to determine what the claims 1-13 and 16 of the '841 Patent cover and what they do not cover. It is my opinion that these claims are indefinite.  Specifically, the term "having an average molecular weight of between about 5,500 to about 10,000 daltons" by itself is not defined in the patent, and the methodology to determine molecular weight is not defined in the patent.  The specification provides little to no guidance on how to measure molecular weight.  Because it is unclear to me what type of method to measure the average molecule weight one should use, claims 1-13 and 16 of the '841 Patent are indefinite.

## VII.   THE '180 PATENT
### A.  BACKGROUND OF THE PATENT

The '180 Patent, entitled "Hyaluronic Acid and Chondroitin Sulfate Based Hydrolyzed Collagen Type II and Method of Making Same," issued on August 15, 2006, from an application filed on June 17, 2004.  The named inventor of the '180 Patent is Suhail Ishaq.  According to the Abstract, the '180 Patent relates to "[h]ydrolyzed collagen type II powder compositions for inducing cartilage formation in an individual, method of preparing the compositions and use of the compositions in treating connective tissue disorder, replenishing skin viscoelasticity.  The compositions are administered through an orally ingestible delivery medium for absorption into the gastrointestinal tract.  The compositions are administered through a topical delivery medium for absorption into a dermis of the individual."

### B.  OVERVIEW OF THE PRIOR ART

It is my opinion that claims 1-23 of the '180 Patent are rendered obvious in light of the prior art references discussed below, either alone or in combination with other prior art specifically discussed below. In particular, each of these prior art references may be combined with other prior art references, or with information known to persons skilled in the art at the time of the alleged invention.  I understand that the '180 asserted claims include the claims relied upon by Plaintiff for its infringement allegations.

The prior art references identified below have been discussed above with the exception of the following: "Suppression of type II collagen-induced arthritis by intragastric administration of soluble type II collagen.Proc." by C Nagler-Anderson, L A Bober, M E Robinson, G W Siskind, and G J Thorbecke,  Nat. Acad. Sci. 1986. 83: 7443-7446 ("Nagler-Anderson").

Nagler-Anderson describes a preparation of Type II collagen from bovine articular

26

cartilage by pepsin proteolysis. It also discloses the use of Type II collagen dissolved in Acetic acid prior to use as well as a denatured Type II collagen prepared by heating at 56º for 45 minutes. Intragastric Type II suppressed incidence of induced Type II arthritis is also disclosed.

### C.  OBVIOUSNESS

My understanding of the law regarding obviousness is set forth above.  In this section, I will address the various factors and combinations that form the basis of my opinion that one of skill would have found the alleged invention claimed in '180 patent to have been obvious at the time of invention.

**i.**     Scope and Content of Prior Art

The scope and content of the prior art are discussed above.

**ii.**     Level of Ordinary Skill in the Art

My opinion of the level of ordinary skill in the field of art is noted above at Section II.

**iii.**     Differences between the Prior Art and the Claimed Invention

There were differences between some of the claims of the '180 Patent and some of the prior art that I discussed above.  The following differences would have been obvious to one of ordinary skill in the art.  Additionally, persons of ordinary skill were motivated to, and in fact did, combine the prior art elements recited in the '180 Patent claims to achieve the same results described in the '180 Patent specification.  Together, the combination of these familiar elements yields only expected results.  Below is an element-by-element claim chart comparing each of the asserted claims of the '180 Patent to prior art that renders the asserted claims invalid as obvious.

**iv.**     Combinations

| Patent No. 7,091,180 – Asserted Claims | At the time of the alleged invention, it would have been obvious to combine Milan, Koepff, Sturrock and DeVore, Methods in Enzymology, Lane, and Nagler-Anderson to achieve Claims 1-23 |
| --- | --- |
| 1. A composition and a corresponding test analysis, wherein the composition is derived from an animal product having (a) hydrolyzed collagen type II having an average molecular weight of between about 50 and about 10,000 daltons and (b) a measurable amount of hyaluronic acid; and the test analysis shows that the hyaluronic acid comprises at least 10% of the composition. | The Methods in Enzymology teach that cartilage is rich in proteoglycans which constitute up to 50% of the dry weight. Chondroitin sulfate is the predominant component of proteoglycans. Hyaluronic acid comprises an important binding domain for sulfated glycosamino glycans forming the proteoglycan aggregate and Milan teaches the preparation of an enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons.  In my opinion there is motivation to combine these references to render obvious the |

27

| | asserted claim 1 of the '180 Patent. |
|---|---|
| 2. The composition and corresponding test analysis of claim 1, wherein the composition further comprises at least 20% chondroitin sulfate. | See discussion above re Claim 1 |
| 3. The composition and corresponding test analysis of claim 1, wherein the animal product comprises a sternum. | See discussion above re: Claim 1<br><br>Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 3 of the '180 Patent. |
| 4. The composition and corresponding test analysis of claim 1, wherein the animal product comprises tissue of a bird. | See above discussion re: Claim 1<br><br>Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 4 of the '180 Patent. |
| 5. The composition and corresponding test analysis of claim 4, wherein the bird is a chicken. | See above discussion re: Claim 1<br><br>Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 5 of the '180 Patent. |
| 6. The composition and corresponding test analysis of claim 1, wherein the animal product comprises a chicken sternum. | See above discussion re: Claim 1<br><br>Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 6 of the '180 Patent. |
| 7. The composition and corresponding test analysis of claim 1, wherein the animal product comprises chicken sternum cartilage. | See above discussion re: Claim 1<br><br>Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 7 of the '180 Patent. |
| 8. The composition and corresponding test analysis of claim 1, wherein the animal product comprises at least of hyaline and articular cartilage. | See above discussion re: Claim 1<br><br>Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 8 of the '180 Patent. |
| 9. The composition and corresponding test analysis of claim 1, wherein the animal | See above discussion re: Claim 1 |

28

| | |
|---|---|
| product comprises tissue of at least one of a cow, a pig, and a shark. | Lane teaches preparation of use of shark cartilage for therapeutic applications. In my opinion there is motivation to combine these references to render obvious the asserted claim 9 of the '180 Patent. |
| 10. The composition and corresponding test analysis of claim 1, wherein at least some of the composition is heat hydrolyzed. | See above discussion re: Claim 1<br><br>Nagler-Anderson teach preparation of heating Type II collagen at 56°C for 45 minutes to denature Type II collagen. In my opinion there is motivation to combine these references to render obvious the asserted claim 10 of the '180 Patent. |
| 11. The composition and corresponding test analysis of claim 1, wherein the collagen type II is enzymatically hydrolyzed. | See above discussion re: Claim 1<br><br>Sturrock teaches a method for preparing Type II collagen from chicken sterna including enzymatically digesting powdered sterna to produce soluble type II collagen. In my opinion there is motivation to combine these references to render obvious the asserted claim 10 of the '180 Patent. |
| 12. The composition and corresponding test analysis of claim 1, wherein the hyaluronic acid is enzymatically hydrolyzed. | See above discussion re: Claim 1<br><br>Since cartilage inherently contains hyaluronic acid, it is obvious that hyaluronic will be enzymically hydrolyzed along with type II collagen. |
| 13. The composition and corresponding test analysis of claim 1, further comprising chondroitin sulfate that is enzymatically hydrolyzed. | See above discussion re: Claim 1<br><br>Since cartilage inherently contains chondroitin sulfate, it is obvious that chondroitin sulfate will be enzymically hydrolyzed along with type II collagen. |
| 14. The composition and corresponding test analysis of claim 1, wherein the composition is at least partially dehydrated. | See above discussion re: Claim 1<br><br>It would be obvious that test analysis can be conducted on partially dehydrated test samples. |
| 15. The composition and corresponding test analysis of claim 1, wherein the composition is a spray dried. | See above discussion re: Claim 1<br><br>Koepff teaches that the preparation of enzymatically hydrolyzed collagen including spray drying the hydrolyzed collagen. In my opinion there is motivation to combine these references to render obvious the asserted claim 15 of the '180 Patent. |

29

| | |
|---|---|
| 16. The composition and corresponding test analysis of claim 1, further comprising deploymerized chondroitin sulfate. | See above discussion re: Claim 13 |
| 17. The composition and corresponding test analysis of claim 1, further comprising at least 20% depolymerized chondroitin sulfate. | See above discussion re: Claim 13 |
| 18. A nutritional supplement that provides at least 500 mg of the composition of claim 1 in an effective daily amount. | Koepff teaches the administration of 0.5g (500mg) to 12 g (12,000mg) of hydrolyzed collagen peptides for treatment of arthroses.  In a described clinical study, hydrolyzed collagen peptides were administered at 10g of substance per day.  In my opinion there is motivation to combine this reference with the previous references to render obvious the asserted claim 18 of the '180 Patent. |
| 19. A nutritional supplement that provides at least 1000 mg of the composition of claim 1 in an effective daily amount. | See above discussion re: Claim 18 |
| 20. A nutritional supplement comprising a hard capsule containing at least some of the composition of claim 1. | Milan and Koepff teach administration of a hydrolyzed collagen in the form of a paste, syrup solution, granule, compact or instantized powder.  In my opinion there is motivation to combine these references to render obvious the asserted claim 20 of the '180 Patent. |
| 21. A nutritional supplement comprising a tablet containing at least some of the composition of claim 1. | Milan and Koepff teach administration of a hydrolyzed collagen in the form of a paste, syrup solution, granule, compact or instantized powder.  In my opinion there is motivation to combine these references to render obvious the asserted claim 21 of the '180 Patent. |
| 22. A nutritional supplement comprising at least some of the composition of claim 1 in a dosage form selected from the group consisting of a dispersible powder, a granule, an aqueous suspension, an oil suspension, an emulsion, a soft capsule, a syrup and an elixir. | Milan and Koepff teach administration of a hydrolyzed collagen in the form of a paste, syrup solution, granule, compact or instantized powder.  In my opinion there is motivation to combine these references to render obvious the asserted claim 22 of the '180 Patent. |
| 23. A method of inducing cartilage formation in an individual with a connective tissue disorder, comprising | See discussion above re: Claim 22 |

30

| orally administering to the individual an effective daily cartilage-inducing amount of the composition of claim 1. | |

**v.** Secondary Considerations of Obviousness

I have been informed that certain secondary considerations may be examined to determine whether a certain invention would have been obvious to one of ordinary skill in the art.  As I indicate above, I understand that secondary considerations may be addressed when relevant. In this case, it is my opinion that there are no secondary considerations that overcome the obviousness determination.

**D.  INDEFINITENESS**

In my opinion a person of skill would not have been able to determine what the claims 1-23 of the '180 Patent cover and what they do not cover. It is my opinion that these claims are indefinite.  Specifically, the term "having an average molecular weight of between 50 and about 10,000 daltons" by itself is not defined in the patent, and the methodology to determine molecular weight is not defined in the patent.  The specification provides little to no guidance on how to measure molecular weight.  Because it is unclear to me what type of method to measure the average molecule weight one should use, claims 1-23 of the '180 Patent are indefinite.

**VIII.   THE '348 PATENT**
**A.  BACKGROUND OF THE PATENT**

The '348 Patent, entitled "Therapeutic Composition Comprising Hyaluronic Acid and Chondroitin Sulfate and Method of Making Same," issued on September 21, 2010, from an application filed on August 26, 2005.  The named inventor of the '348 Patent is Suhail Ishaq. According to the Abstract, the '348 Patent relates to "[h]ydrolyzed collagen type II powder compositions for inducing cartilage formation in an individual, method of preparing the compositions and use of the compositions in treating connective tissue disorder, replenishing skin viscoelasticity.  The compositions are administered through an orally ingestible delivery medium for absorption into the gastrointestinal tract.  The compositions are administered through a topical delivery medium for absorption into a dermis of the individual."

**B.  OVERVIEW OF THE PRIOR ART**

It is my opinion that claims 1-6, 8-16, and 24-25 of the '348 Patent[3] are rendered obvious in light of the prior art references discussed below, either alone or in combination with other prior art specifically discussed below. In particular, each of these prior art references may be combined with other prior art references, or with information known to persons skilled in the art at the time of the alleged invention.  I understand that the '348 asserted claims include the claims relied upon by Plaintiff for its infringement allegations.

The prior art references identified below have been discussed above with the exception of the following:  U.S. Patent 5,645,851 (the "'851 Patent" or "Moore") – The '851 Patent, entitled

---

[3] It is my understanding that Plaintiff's Disclosure of Asserted Claims do not allege infringement of claims 7 or 17-23 of the '348 Patent.

"Product for Alleviating the Symptoms of Arthritis in Mammals" was filed on April 9, 1996 and issued on July 8, 1997.  The '851 Patent describes a composition for treatment of arthritis. A disclosed composition contains Type II collagen prepared from chicken cartilage.  The '851 Patent also discloses a water insoluble suspended in a liquid form for oral consumption.

### C.  OBVIOUSNESS

My understanding of the law regarding obviousness is set forth above.  In this section, I will address the various factors and combinations that form the basis of my opinion that one of skill would have found the alleged invention claimed in '348 patent to have been obvious at the time of invention.

> **i.**   Scope and Content of Prior Art

The scope and content of the prior art are discussed above.

> **ii.**   Level of Ordinary Skill in the Art

My opinion of the level of ordinary skill in the field of art is noted above at Section II.

> **iii.**   Differences between the Prior Art and the Claimed Invention

There were differences between some of the claims of the '348 Patent and some of the prior art that I discussed above.  The following differences would have been obvious to one of ordinary skill in the art.  Additionally, persons of ordinary skill were motivated to combine the prior art elements recited in the '348 Patent claims to achieve the same results described in the '348 Patent specification.  Together, the combination of these familiar elements yields only expected results.  Below is an element-by-element claim chart comparing each of the asserted claims of the '348 Patent to prior art that renders the asserted claims invalid as obvious.

> **iv.**   Combinations

| Patent No. 7,799,348 – Asserted Claims | At the time of the alleged invention, it would have been obvious to combine Milan with Koepff with Moore with Sturrock with Methods in Enzymology, and with Nagler-Anderson to achieve Claims 1-25 |
|---|---|
| 1. A method of preparing a hyaluronic acid-containing supplement, comprising: hydrolyzing an animal product under conditions that produce a composition containing hydrolyzed type II collagen having an average molecular weight of between about 50 and about 10,000 daltons and at least 10% hyaluronic acid; obtaining test results showing that the composition contains at least 10% hyaluronic acid; and forming the composition into a supplement that is deliverable to the body of a subject, thereby producing a hyaluronic acid- | Milan teaches the preparation of an enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons. In my opinion there is motivation to combine these references to render obvious the asserted claim 2 of the '327 patent and Methods of Enzymology, Volume 82 teach that that cartilages are rich in proteoglycans which constitute up to 50% of the dry weight. Chondroitin sulfate is the predominant component of proteoglycans. |

| containing supplement. | Hyaluronic acid comprises an important binding domain for sulfated glycosaminoglycans forming the proteoglycan aggregate.  In my opinion there is motivation to combine these references to render obvious the asserted claim 1 of the '348 Patent. |
|---|---|
| 2. The method of claim 1, wherein the hydrolyzed composition further contains at least 20% chondroitin sulfate. | See discussion above re Claim 1 |
| 3. The method of claim 1, wherein the animal product is a chicken sternum. | See discussion above re Claim 1 Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 3 of the '348 Patent. |
| 4. The method of claim 1, wherein the animal product comprises a cartilaginous portion of a bird. | See discussion above re Claim 1 Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 4 of the '348 Patent. |
| 5. The method of claim 4, wherein the bird is a chicken. | See discussion above re Claim 1 Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 5 of the '348 Patent. |
| 6. The method of claim 1, wherein the animal product comprises at least one of hyaline and articular cartilage. | See discussion above re Claim 1. Sturrock teaches a method for preparing Type II collagen from chicken sterna. In my opinion there is motivation to combine these references to render obvious the asserted claim 6 of the '348 Patent. |
| 8. The method of claim 1, wherein the step of hydrolyzing comprises heat hydrolyzing the animal product. | See discussion above re Claim 1 Nagler-Anderson teach preparation of heating Type II collagen at 56ºC for 45 minutes to denature Type II collagen. In my opinion there is motivation to combine these references to render obvious the asserted claim 8 of the '348 patent |
| 9. The method of claim 1, wherein the step of hydrolyzing comprises enzymatically | See discussion above re Claim 1. Sturrock teaches a method for preparing |

33

| | |
|---|---|
| hydrolyzing the animal product. | Type II collagen from chicken sterna including enzymatically digesting powdered sterna to produce soluble type II collagen. In my opinion there is motivation to combine these references to render obvious the asserted claim 9 of the '348 Patent. |
| 10. The method of claim 1, further comprising the step of at least partially dehydrating the hyaluronic acid-containing supplement. | See discussion above re Claim 1 In my opinion, it would be obvious that test analysis can be conducted on partially dehydrated test samples. |
| 11. The method of claim 1, further comprising the step of spray drying the hyaluronic acid-containing supplement. | See discussion above re Claim 1 Koepff teaches preparation of enzymatically hydrolyzed collagen including spray drying the hydrolyzed collagen. In my opinion there is motivation to combine these references to render obvious the asserted claim 11 of the '348 Patent. |
| 12. The method of claim 1, wherein the step of forming the composition into a supplement comprises forming the composition into a tablet or capsule, wherein each tablet or capsule comprises between 300 mg and 1,000 mg of hydrolyzed type II collagen. | See discussion above re Claim 1 Koepff teaches the administration of 0.5g (500mg) to 12 g (12,000mg) of hydrolyzed collagen peptides for treatment of arthroses.  In a described clinical study, hydrolyzed collagen peptides were administered at 10g of substance per day. Milan and Koepff teach administration of a hydrolyzed collagen in the form of a paste, syrup solution, granule, compact or instantized powder.   In my opinion there is motivation to combine these references to render obvious the asserted claim 12 of the '348 Patent. |
| 13. The method of claim 12, wherein each tablet or capsule contains 500 mg of hydrolyzed type II collagen. | See discussion above re: claim 12 |
| 14. The method of claim 1, wherein the hyaluronic acid-containing supplements contain an amount of hydrolyzed type II collagen such that a subject may be provided with a daily amount of 500 mg to 5,000 mg of hydrolyzed type II collagen from said supplements. | See discussion above re Claim 1 Koepff teaches the administration of 0.5g (500mg) to 12 g (12,000mg) of hydrolyzed collagen peptides for treatment of arthroses.  In a described clinical study, hydrolyzed collagen peptides were administered at 10g of substance per day. |

34

| | |
|---|---|
| | Milan and Koepff teach administration of a hydrolyzed collagen in the form of a paste, syrup solution, granule, compact or instantized powder, and Methods of Enzymology, Volume 82 teach that that cartilages are rich in proteoglycans which constitute up to 50% of the dry weight. Chondroitin sulfate is the predominant component of proteoglycans. Hyaluronic acid comprises an important binding domain for sulfated glycosaminoglycans forming the proteoglycan aggregate. In my opinion there is motivation to combine these references to render obvious the asserted claim 14 of the '348 Patent. |
| 15. The method of claim 1, wherein the step of forming the composition into a supplement comprises forming the composition into a further comprising the step of packaging the supplement including the composition as dispersible powder, a granule, an aqueous suspension, an oil suspension, an emulsion, a soft capsule, a syrup or an elixir. | See discussion above re Claim 1<br><br>Milan and Koepff teach administration of a hydrolyzed collagen in the form of a paste, syrup solution, granule, compact or instantized powder. In my opinion there is motivation to combine these references to render obvious the asserted claim 15 of the '348 Patent. |
| 16. A method of administering collagen to an individual, comprising: hydrolyzing an animal product under conditions that produce a composition containing hydrolyzed type II collagen having an average molecular weight of between about 50 and about 10,000 daltons and at least 10% hyaluronic acid; obtaining test results showing that the composition contains at least 10% hyaluronic acid; forming the composition into an oral supplement; and orally administering the supplement to the individual. | Trentham teaches the oral administration of Type II collagen protein for treating rheumatoid arthritis in an amount effective and for a period of time sufficient to decrease at least one symptom selected from the group consisting of joint tenderness, joint swelling, grip strength, and 50-foot walk time and Milan et al teaches the preparation of an enzymatically hydrolyzed collagen prepared from animal connective tissue having a molecular weight ranging from 1000 daltons to 40,000 daltons and Methods of Enzymology, Volume 82 teach that that cartilages are rich in proteoglycans which constitute up to 50% of the dry weight. Chondroitin sulfate is the predominant component of proteoglycans. Hyaluronic acid comprises an important binding domain for sulfated glycosaminoglycans |

35

| | |
|---|---|
| | forming the proteoglycan aggregate. In my opinion there is motivation to combine these references to render obvious the asserted claim 16 of the '348 Patent. |
| 24. The method of claim 1, wherein the step of forming the composition into a supplement comprises integrating the composition as part of a topical delivery medium. | See discussion above re Claim 1<br><br>Additionally, Milan and Koepff teach compositions in the form of liquid suspensions and pastes that could be used for topical administration for absorption into dermis. |
| 25. The method of claim 16, wherein the individual has a connective tissue disorder selected the group consisting of a degenerative joint disease, a joint defect, osteoarthritis, polychondritis, a cartilage injury, and combinations thereof; and wherein the step of orally administering the supplement to the individual comprises orally administering an effective daily cartilage-inducing amount of the composition. | See discussion above re Claim 16<br><br>Trentham teaches the oral administration of Type II collagen protein for treating rheumatoid arthritis in an amount effective and for a period of time sufficient to decrease at least one symptom selected from the group consisting of joint tenderness, joint swelling, grip strength, and 50-foot walk time and Koepff teaches the treatment of arthroses or degenerative joint diseases with hydrolyzed collagen peptides. In my opinion there is motivation to combine these references to render obvious the asserted claim 25 of the '348 Patent. |

**v.** Secondary Considerations of Obviousness

I have been informed that certain secondary considerations may be examined to determine whether a certain invention would have been obvious to one of ordinary skill in the art. As I indicate above, I understand that secondary considerations may be addressed when relevant. In this case, it is my opinion that there are no secondary considerations that overcome the obviousness determination.

**D. INDEFINITENESS**

In my opinion a person of skill would not have been able to determine what claims 1-6, 8-16, and 24-25 of the '348 Patent cover and what they do not cover. It is my opinion that these claims are indefinite. Specifically, the term "having an average molecular weight of between about 50 and about 10,000 daltons" by itself is not defined in the patent, and the methodology to determine molecular weight is not defined in the patent. The specification provides little to no guidance on how to measure molecular weight. Because it is unclear to me what type of method to measure the average molecule weight one should use, claims 1-6, 8-16, and 24-25 of the '348 Patent are indefinite.

36

IX.    **CONCLUSION**

For the foregoing reasons, it is my opinion that every asserted claim of the Asserted Patents is invalid.

Dated: March 8, 2013

By: _Dale P. Devore_

Dale P. Devore

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

      I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 4000 MacArthur Boulevard, West Tower, Suite 1100, Newport Beach, California 92660.

      On March 8, 2013, I caused **ARTHRO 7'S EXPERT REPORT** to be served to the address and by the method of service described as follows:

**Jennifer A. Trusso**
**jtrusso@sheppardmullin.com**
**Sheppard Mullin Richter and Hampton LLP**
**650 Town Center Drive 4th Floor**
**Costa Mesa, CA 92626**

**Derrick C. Highes**
**dhughes@scckg.com**
**Smith Campbell Clifford Kearney Gore**
**1800 North Broadway Suite 200**
**Santa Ana, CA 92706**

**Jason Kelly Smith**
**jsmith@scckg.com**
**Smith Campbell Clifford Kearney Gore**
**1800 North Broadway Suite 200**
**Santa Ana, CA 92706**

**Steven C. Smith**
**ssmith@scckg.com**
**Smith Campbell Clifford Kearney Gore**
**1800 North Broadway Suite 200**
**Santa Ana, CA 92706**

*Attorneys for Plaintiff, Biocell Technology LLC*

[ X ]        (BY EMAIL)

[    ]        (BY PERSONAL SERVICE) I delivered to Nationwide Legal, LLC, a courier service authorized to receive documents to be delivered to the above on the same date.  A proof of service signed by the authorized courier will be filed with the court upon request.

[    ]        (BY FAX) On 3/8/2013 9:42 PM, I transmitted the above-described document(s) by facsimile, in compliance with CCP § 1013 and CRC §§ 2.300

19500.1

**PROOF OF SERVICE**

et seq.  The transmission originated from facsimile phone number (949) 258-5081 and was reported as complete and without error.

[   ]     (BY MAIL) I am "readily familiar" with the firm's practice for collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Newport Beach, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[   ]     (BY OVERNIGHT DELIVERY) I caused said envelope (s) to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressee (s).

I declare that I am employed in the office of a member of the bar of their court at whose direction the service was made.

Executed on March 8, 2013 at Newport Beach, California.

_____
Julie R. Anderson

18505.1                                    2